Good morning to all of you. I'm Dale Gallipo on behalf of the appellants, and I would like to reserve five minutes. I always mess up with doing that, but I'm going to try. I'll try to help you out, but keep your eye on the clock as well, please. Okay. I appreciate that. So without repeating everything we have in our briefs, I do want to focus on a few issues. I think the biggest issue here from our perspective is qualified immunity. We think the court correctly found there were tribal issues of fact with respect to the constitutional violations under the Fourth and Fourteenth Amendment, and the court, as you know, declined to exercise state jurisdiction. So the question and a hot topic, obviously, recently has been qualified immunity. What we think makes this case particularly important is, and I think it's an undisputed fact, the officers conceded, and I think it's separate statement item 138 of the defense separate statement, that they were trained that someone hobbled, placed prone, could interfere with their ability to breathe, and cause them to die. That's also reiterated in separate statement items 260 to 263, 301 and 302, and 314. So these officers were trained and were aware that if they hobbled someone, in this case there was a connection, and as you know, eventually a second and third hobble, and placed them chest down. That could interfere with their ability to breathe and cause them to die. And Drummond v. City of Anaheim, which we think is a very important case related to this case, stands for two important propositions. First, although the facts are somewhat distinguishable, it talks about the risk of restraint and positional asphyxia when having someone in a chest down position, albeit in that case there was evidence of more weight applied than this case. But Drummond also said that the officers' training should be considered not only in whether you decide whether there was a constitutional violation or not, because obviously if they violated their own training, that's a factor to consider, but also- It's a factor, but as you are well aware, we've been criticized multiple times by the right at too high of a level of generality. So when you look at the facts of Drummond, it's quite distinguishable, isn't it? Well, I- Are there some distinctions? The answer is yes. However, I would say with the Supreme Court saying that some courts, and maybe even the Ninth Circuit, is defining with too general a level, I think it's been taken way too far. I think what the Supreme Court was suggesting in part, don't just cite Graham and Garner and say you can't use excessive force. Look more to the specifics. I don't think we want to be in a place that if we can't find a specific case on all fours, then the officers get a pass. I don't think that's what we want, and particularly not only Drummond, but we also cited the Gutierrez case. But that's why I get back to the training, because what Drummond basically says, were the officers on notice that their conduct would be or could be objectively unreasonable? And when officers admit we were all trained not to do that, because that can cause someone to die, and then they do it, and the person dies, we don't believe that the officers should be able to be shielded by qualified immunity. What is that training, that if somebody is hobbled, you can't place them on their stomach, period? Or is it for certain, are there caveats involved in that, with additional pressure on the back area? It's two-fold, Judge Winn. First of all, they acknowledge that if someone is hobbled, in this case they were essentially hog-tied, which we think is important, you don't leave them on the chest for an extended period of time. Now it's true, there's nothing specific that says, is it 30 seconds, is it 60 seconds? The defense is careful to argue in their paperwork, we never had them chest down more than two or three seconds. Because we know, and they conceded this in their paperwork, we know that would be inappropriate. But that never happened. But that's a disputed issue of fact, because we believe the timeline, the last time he was put in the car, he was essentially chest down for five minutes. Now, I understand, and that's what they basically all said in their initial statements. Then we get to depositions, and of course at that time they said, well, I did say that in my statement, but no one followed up and asked me how long, so they conveniently said it was only two or three seconds. But the evidence is he was chest down when he was put in the car the last time, when they claim that he picked his head up, when they claim his feet were pressed against the window, when the second hobble was applied, when the third hobble was applied, when the door was closed, and when he finally went out. And so I would say that their own training is don't do it, put him on the left side as soon as you can. And what's important, Judge Wynn, is one of the separate statement items, and I think it's 224 and 226, the officer said we were going to put him on his left side at some point. We were going to leave him in the position he was in, which we think is circumstantially supports he was not on his left side as the defense claims. So as you know, what the defense is basically saying, he was never chest down for more than two or three seconds, and he was on his left side. But we feel that's highly disputed. They also claim that there's an issue as to cause of death. We believe the overwhelming evidence supports that he died of positional slash restraint asphyxia. But the other point I wanted to make, Judge Wynn, with respect to drum is the weight. Because one of the distinguishing factors that Judge Walter considered is do you have as much weight in this case as you have in Drummond? And the answer is you don't. Because in Drummond, I think it was 500 pounds. We're not suggesting there was 500 pounds. But two officers, Gentry, again, some of this from their initial statement, separate statement item 217, Gentry put pressure on Slater's backside with his right knee. And Brandt, separate statement items 92 and 93, had his right foot on Mr. Slater's left shoulder. Now, this was during the about 86 seconds, about a minute and a half, that they were applying the second and third hobble. And we believe, at least a reasonable inference is, that's when he went out. Now, they suggest he was moving and thrashing the whole time. We don't believe that's the evidence. In fact, Sergeant Rude said, I never saw him talking or moving even during the application of the second and third hobble, and certainly not afterwards. Another thing that we think is extremely important is the fact that he, when he was taken out of the car and put in a recovery position, he was not breathing and unresponsive. And a paramedic that was there, paramedic Beard, checked him and he had a pulse. And then he checked him about a minute later and the pulse went away. As explained by Dr. O'Halloran in his declaration, that supports that it was death by asphyxia, not by drug intoxication. And the reason is, when someone asphyxiates, their breathing stops before their heart stops. So he stopped breathing, but the heart was still beating for some time. That's why he had a pulse. If someone dies of merely drug intoxication, without an asphyxial component, the heart stops and simultaneously the breathing stops. And the medical examiner, and I'm not blaming her, she had very limited information about the that he was prone and hogtied and chest down in five minutes. She had none of that information. And the way you diagnose asphyxia is with history. You need to know the history to know what happened. What position was he in when he lost consciousness, when he stopped breathing? And two contributing factors, we believe, were the vomit, which we think partially obstructed his breathing as well. And we believe a portion of his face was into the back seat, which also limited his ability to breathe. Was he moving some as he was restrained? The answer is yes, but we believe he was fighting to breathe and to live. So the reason I mentioned the weight and the pressure by Brandt and Gentry during the application of the second and third hopples, we believe, Judge Wynn, that that brings it within Drummond. It's close enough to Drummond to say you can't have someone chest down. Now in Drummond there was only one hobble. Here we have three hobbles. You can't put someone chest down. That alone, we believe, would come within the obvious, even if there was no weight applied. We believe having someone hogtied, and by way of background, Mr. Slater committed no serious crime. They knew he was nonviolent from past conducts. They knew he had a mental illness and was 51-50. He was arrested without, handcuffed initially, without incident. They put him in the back of a car while handcuffed. They pepper sprayed him three times, maybe four while handcuffed. We believe that was excessive. They don't believe he was completely decontaminated. Then they put him back into the back seat with all the pepper spray and put him chest down. It's clear that when you're going to transport someone, and they thought they were going to transport them to the hospital for care, you sit them up. Even the paramedics were there. They called the paramedics. That was good, but they should have had the paramedics take them to the hospital. What's so unfortunate about this, this could have been avoided. They had the specific training. I would say, Judge Wynn, if they didn't have that training, if they weren't aware at the time not to do that because someone could die, then we would have a different discussion. But when it's undisputed they had that training, don't do that because someone could die. They do it and someone dies, and then they want to stand before the court and say, we weren't aware that was wrong. We didn't, am I? You're down to pass the time that you wanted to save. Do you want to save the rest of your time? I think I better, and maybe I can field any of the questions at the end if that's okay. Thank you. Thank you very much. Good morning, your honors. Tony Sain on behalf of defendants, appellees, and cross appellants, the county of San Bernardino, and the four defendant deputies. May it please the court, am I entitled to reserve any time for rebuttal on the cross appeal issues? You have a cross appeal, you can if you want to. Thank you, your honors. Then I would like to reserve two minutes for rebuttal on the cross appeal. Your honor, the court should affirm summary judgment on behalf of the defendants under the first prong of qualified immunity for two reasons. First, as to all of the outside of the car force, the undisputed evidence in this case, not allegations, shows that Mr. Slater was violently resisting despite multiple commands, multiple warnings that force would be used, and after he had assaulted a deputy and tried to escape. Secondly, as to the inside of the car, the restraint force, despite the allegations that plaintiffs have put forward, none of the admissible evidence in this case actually supports their contention that Mr. Slater was restrained in a face down, flat, prone position for more than a few seconds. What evidence of violence was there prior to his being pepper sprayed the first time? Prior to the incident itself, all the deputies were aware of his prior conduct where he had violently acted towards officers. Yeah, but what evidence is there of violence this time? Yes, your honor. Of violence prior to his being pepper sprayed? Yes, your honor. Seconds before the first deployment of pepper spray and after the multiple warnings, after the multiple commands that were not complied with, according to the deputy, Mr. Slater assaulted him by kicking him and then trying to push out of the car, trying to escape his confinement. And it was that violence, that threat against the solo deputy that prompted the deployment of the first pepper spray. That can be seen on the video? On the video, the angle that we can see is blocked by the car door. So what you can see is you can see the deputy reacting to the kick and then doing the pepper spray, but unfortunately the door itself obstructs the kick. But we have the testimony and we have the other sound effects that sort of support the idea that he is resisting at that point in time. After that first pepper spray, additional commands are given they're not complied with, a second burst of pepper spray ensues, still no compliance, still continued resistance. This is during the time that he's still in the car? Yes, your honor. And there's pepper spray, I guess, is applied at least three times? Yes, your honor. Yes, there's actually two in the car and one as he's coming out of the car, your honor, all within about a 20 second period. After the first pepper spray, there's non-compliance, there's additional resistance. After the second play, the resistance accelerates. It actually increases and he starts to force his way out of the car. The solo deputy at that point has a choice. He can either face a suspect who, if he gets away, can overcome the deputy, could headbutt him, could kick him, could knock him down, could take the keys, could harm somebody. He could either regain control of that suspect or not. And he chooses to try to regain control according to his training by getting him to the ground as quickly as he can. He uses the suspect's momentum as he's coming out of the car to throw him back down to the ground. And then on the ground, he tries to overcome that resistance. And we can see this in the video. We can see the suspect, despite being in handcuffs, violently resisting, trying to get up, flailing, rolling, all of these other things that we can see in the video consistent with the deputy's account. Counsel, I was curious on page nine of the district court's order, which is ER 12. That's when the district court really kind of sentences the district court wrote that I was wondering if you could help me understand, and I may ask opposing counsel their take on the same, equal time, right? In the middle of page nine, the district court writes, it is clear from the evidence that Brant merely placed his foot against Slater's shoulder. It wasn't clear, first, what evidence the district court was referring to, and then second, defend the district court. Explain to me why the district court should be weighing evidence in a qualified immunity setting as opposed to a summary judgment setting. Your Honor, first, in terms of the evidence that the court was relying upon, there was testimonial evidence and video evidence. If the court directs its attention to the composite video, which is supplemental record, page 20, exhibit one. The composite video is the one where we see multiple angles appearing back and forth. It has the transcript on the screen. And I've seen that. Thank you, Your Honor. If you direct your attention to that composite video at approximately the 145, 25 second mark, you'll see Deputy Brant place his right foot sort of shoving it sideways into the car. And the reason he's doing that at that point is at that point, Mr. Slater is trying to slide out of the driver's side of the door, driver's side door, sideways as though to escape. So the pressure is applied to the top of the shoulder, which is then in a sideways position. It's a lateral pressure, not a downward pressure. And that video evidence is corroborated by both of the deputies' testimonies. So I believe that's the evidence the court was referencing. In terms of why that's relevant in the qualified immunity analysis, the qualified immunity analysis, as this court is well aware after Casella, depends entirely on what set of facts are at issue in the particular case in front of the court and whether or not there was controlling authority with similar facts that would have put the deputies on notice that their conduct might've been unconstitutional. So in analyzing whether or not the facts of this case are similar to prior precedent with similar facts, you have to get into a factual analysis. That makes total sense. I guess my question though was, it seemed to me that at this phase, the district court was weighing the evidence at the qualified immunity stage as opposed to taking the plaintiff's version of the facts and then determining if qualified immunity applies. And that's why I'm, yeah, you have to do this factual comparison and it can be tough sometimes, but I thought you had to assume the facts as the plaintiffs wanted them before you could engage in qualified immunity. So tell me, tell me I'm wrong and why. You're not entirely wrong. You have to assume the plaintiff's version of the facts to the extent they're supported by the evidence. When you're evaluating qualified immunity, whether you're evaluating just qualified immunity or regular summary judgment, evaluating disputes of fact, you look to evidence and evidence that supports reasonable inferences of disputes of fact. And here the evidence did not support the allegations, the disputes that plaintiff were contending. Plaintiff can get up here and say anything that they want happened, but if it's not supported by the evidence, you don't get to a genuine dispute of material fact. Well, what about the facts that Mr. Gallipo had outlined in his arguments, the fact that the officers were trained not to play somebody who has been hobbled, particularly here in this case, three different restraints, chest down. And the fact that officers had in their initial statement indicated that he was chest down for about five minutes. So that coupled with the training, I mean, I know that the deposition testimony varies in terms of the time estimate, but why don't those little pieces of evidence create tribal issues of fact? Well, first off, in the initial statements, the deputies did not say he was chest down for five minutes. That's factually inaccurate and the statements can bear that out. The deputies are never asked how long he's in a chest down position. What the deputies say is that he's inserted into the back seat in a face down or a chest down position. And even his initial interview, Sergeant Rude says he was slightly canted, i.e. on his side when he was in that back seat. It's not until their depositions that for the very first time in relation to this incident that the deputies are asked, how long was he in a chest down or flat face down position? And all of them testify consistently. He goes in chest down, flat face down, but he's immediately turned onto his side. Now, in terms of the judge's question with regard to the training, the training is that you don't want to keep them flat prone face down for any longer than is necessary to secure them. And once they're secure, you're supposed to roll them onto their side. And the deputies here complied with that training. As soon as they had him in cuffs, as soon as they had him hobbled, they tried to put him on his side. The problem was that even in the back seat, Mr. Slater continued to violently resist. And we can see this on the video. After he's first placed in that back seat, he starts thrashing around. We can see him pop up in vertical. We can see him slamming his back vertically against the back seat of that car. Then he goes horizontal. At one point, we can even see a foot below the door line as he's trying to do whatever, get out. We can see him come out of the passenger side of the vehicle at one point. So the deputies are doing everything they can to restrain him according to their training. And their training is if we can avoid keeping him in a flat prone position, we should. And they did, which is why the only evidence in this case is he only stayed in that flat prone position in the back seat for about two to three seconds. There's one other point that Mr. Galipo raised that I think bears the court's notice. Mr. Galipo mentioned the fact that Deputy Gentry testified to having a knee in Mr. Slater's back at a certain point. And he seemed to conflate that moment in time that happens later when there's a foot against the top of Mr. Slater's shoulder. It's important to remember that those are two completely separate episodes. The knee to the back by Gentry occurs when we're outside of the car before he's placed in that car the final time before the decontamination when it's just Gentry and Deputy Deasy. And Mr. Slater is resisting. Deputy Gentry is trying to hold Mr. Slater down despite the bucks. Gentry falls forward and his knee lands square in the middle of Mr. Slater's back. And it stays on that back for about 40 seconds. But then afterward, when he's outside of that car and the first hobble is applied, Mr. Slater is seated upright for over six minutes. In fact, at one point we see him wiping his face on his knee, presumably to get that pepper spray off. He's then decontaminated. He's taken to the water station and washed off. And it's later in time that he's then placed in the back seat. And the evidence in this case is that when he's placed in that back seat, at no point in time does he have any body weight pressing down on his torso. The evidence in this case is that when he's in that back seat, except for the first two to three seconds, he is on his side. And that's what all the witnesses say. Now the court and plaintiff's counsel point towards- We can't see that from the video though, right? We can see- From the video, it's very dark. He was definitely put in on his stomach. And then you're saying that all the testimony from the officers indicated that they then turned him onto his side as soon as he was put in the car? Correct, Your Honor. And in the video, we can see him go non-horizontal. As I mentioned, in the video, we can see at about the 141.29 mark. So at 141 a.m. in 29 seconds, we can see Mr. Slater move from a horizontal position into a vertical position in that back seat. And what you're looking for is you look for the darkness converting to the white, and then you see the white moving back and forth. That's Mr. Slater. You can see his head and his face slamming himself vertically against that back seat. So the idea that he's horizontal the entire time is completely disproved by the video. But more importantly, in terms of the evidence that plaintiffs try to point toward, in terms of supporting the contention that he was flat prone in that back seat the entire time, the only evidence cited in this case to support that contention was the testimony of Paramedic Beard. But the problem is that Paramedic Beard never says, I saw what his position was on that back seat. Paramedic Beard says, I saw him go in chest down. And then after that, I could not see what his position was on that back seat at all. And our position is that if the evidence is, I don't know, versus witnesses who say it was a certain position, you cannot create a genuine dispute of material fact based on I don't know. I don't know is speculation. You can't even get to a reasonable inference of a disputed fact based on speculation. Yeah. So I was curious, the district court analyzed this as phase one and phase two. I was trying to figure out whose idea was that? I was just curious. I was looking at the briefs and I couldn't figure out who, if the district court did that? I believe so. I believe we referenced the use of force as a outside of the car force, the pepper sprays, the knee strike to the thigh, the first hobble, and the inside of the car force, the second and third hobbling. We find that a little bit cleaner in terms of analysis. I think the court was using phase one and phase two as comparable to that. Thank you. You're welcome, Your Honor. But in terms of, I see I'm down to my final two minutes here. In terms of the inside of the car force, even if, even if Mr. Slater was in a flat prone position, the evidence in this case is non-existent of any body weight being placed on him in that position. And as the Price case shows, when you have a resisting suspect who is placed in a prone position for some period of time, to overcome that resistance, restraint force is deemed reasonable as a matter of law. There were a couple of other points in terms of the Drummond case. Drummond, as Judge Wynn noted, is completely distinguishable. In that case, you had a non-resisting suspect who was restrained in a prone position for over 20 minutes, despite multiple complaints of saying that he couldn't breathe. And in that case, unlike our case, there were multiple witnesses to support plaintiff's account. Here, there are no witnesses to support plaintiff's account, no video evidence. And the forensic evidence that plaintiffs cite to is non-existent. The medical examiner who examined Mr. Slater's body, the only person who did, by the way, found no evidence of any vomit in his lungs, no evidence that he asphyxiated whatsoever, no signs of hemorrhaging, which would be consistent with asphyxia. No evidence supported the idea that he, that asphyxia caused or contributed to Mr. Slater's death, which is why Dr. Shuman found the sole cause of death to be methamphetamine, because he had five times the fatal amount of meth in his system. The plaintiff's expert that they rely upon to try to create a dispute of fact, setting aside the fact that typically expert opinion, particularly conclusory expert opinion, by itself cannot generate factual disputes, is not based on any evidence in this case. Dr. O'Halloran could not point to a single witness who supports the notion that Mr. Slater was restrained for the two plus minutes he would have need to have been restrained in order for him to asphyxiate. He can't point to any medical evidence showing vomit in the lungs. He can't point to any hemorrhaging or any physical external or internal signs that would support death by asphyxia. So the idea that there is actual evidence in this case to support plaintiff's contentions is not consistent with the evidence, and therefore there cannot be a dispute of fact. And on this particular set of facts, defendants were entitled to judgment as a matter of law. Thank you. You're actually over time now, but let me hear from Mr. Calippo. Thank you. With respect to the cause of death, we feel there's very strong evidence to support that he died of asphyxia. As I indicated earlier, Dr. O'Halloran is the chief medical examiner for Ventura County for almost 30 years. And as I mentioned, you know, we have a dead person here, and there's Ninth Circuit authority that says the court should very The person who would be able to say, no, this is what actually happened is not here. That's why in their initial statements, every time they were asked, okay, when you put him in, what was his position? Chest down. Okay, when he was doing that, what was his position? Chest down. Second hobble, what was his position? Chest down. Third hobble, chest down. You said he stopped moving. What was his position? Chest down. Every single time they were asked, one sergeant, and it was kind of a leading question, could he have been slightly candid to his left, slightly? For them now to come in here and say they was never chest down for more than two or three seconds is not supported by this record. And if you really think about it, how in the world could he have been on his left side? The way he was hobbled three ways, his feet pushed up towards his buttocks in the back of that car. And how did he happen just to end up chest down when he became nonresponsive? He clearly was chest down. Obviously, they realized by the time of their depositions, that doesn't look good. So since no one asked you specific times in your statement, we'll just say it was no more than two or three seconds and hope the court buys it. But in this case, as Judge Owens said, we got to take all reasonable inferences in favor of the plaintiffs. And I do agree with you, Judge Owens. I think Judge Walter, on some points, was weighing the evidence, was looking at the evidence and maybe deciding in his mind that he was more persuasive than other evidence. But as you alluded to, that's not the proper standard for summary judgment. You have to assume all the plaintiff's evidence, which I think was well founded in the evidence, and take all reasonable inferences from that evidence. I also would suggest the comment that there was no evidence of any weight at all or pressure applied to him while he was chest down in the back of the car is inconsistent with the record as well. And some of the items are separate statement items 85, 86, 92, 93. 92 and 93 talk about Gentry over his back, straddling his head, Brant with his right foot on his left shoulder, all this going on during the minute and a half of the second and third hobble. 139, Gentry having pressure on his back. 217, Gentry's initial statement putting pressure on Slater's backside with his right knee. And the autopsy photo showed bruising to his back, right in the area where they said they either had a knee or foot on his back, and they were holding him down. They didn't want him to move. It wasn't enough that he was hospital. They didn't want him to be able to move at all. So let's put a second hobble and a third hobble. And they characterize it as violent resisting. I would suggest this is not violent resisting. And I would also suggest that these officers exacerbated this situation. You have a mentally ill man who's handcuffed, who's in the car. There was no contact kick before he was pointed out. And they pepper spray him three times in the face. And they say, boy, after that, he really wanted to get out of the car. I wonder why. So getting back to our initial point, we believe that Drummond and Gutierrez and their undisputed training that you're not supposed to put someone hogtied chest down with or without weight is enough for this case to go back to a reasonable conclusion. We believe taking all reasonable inferences in our favor, there was pressure and weight applied to his back while he was in the back seat. And that's enough to come within Drummond and with their training, enough to put them on notice that their conduct was unreasonable. We've got the arguments for both sides. Thank you very much for your very helpful arguments. The matter is submitted for a decision by the court.
judges: Nguyen, Owens, Antoonii